**E-FILED**
Thursday, 24 September, 2015  01:20:49 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| WANDA J. SHELTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:13-cv-04065-SLD-JEH |
| | ) | |
| JOHN DEERE PARTS DISTRIBUTION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

ORDER

Wanda Shelton sued John Deere Parts Distribution ("Deere")[1] for employment

discrimination and retaliation.  Compl. 2, ECF No. 1.  Deere now moves for summary judgment.

ECF No. 22.  Also before the Court is Shelton's Motion in Letter Form, ECF No. 20, and

Deere's motion to strike it, ECF No. 24.[2]  For the following reasons, Deere's Motion for

Summary Judgment is GRANTED, and the other two motions are MOOT.

**BACKGROUND[3]**

**The Pay Incident**

---

[1] In her complaint, Shelton identified the entity she wished to sue as "John Deere Parts Distribution."  The docket reflects this.  Deere answered as Deere & Company.  *See* Answer 1, ECF No. 4.  The difference—or identity— between these corporate entities might be clearer if Deere had filed a certificate of interest, as required by Local Rule 11.3, or a disclosure statement, as required by Federal Rule of Civil Procedure 7.1, but it did neither.  In any case, Deere has waived any objection it may have had to being misnamed by answering and moving for summary judgment.  *See Williams v. Pennsylvania R.R. Co.*, 91 F.Supp. 652, 657 (D. Del. 1950).

[2] It is unclear, as Deere points out in its Motion to Strike, whether Shelton's filing counts as a motion at all.  *See* Mot. Strike 1–2.  However, having reviewed the materials Shelton submitted in the putative motion and determined upon a grant of summary judgment for Deere, it is not necessary for the Court to reach the issue of whether Shelton's submission can count as a motion, or should be stricken for failure to do so.  *See infra*, p. 19.

[3] The material in this section is, unless otherwise noted, drawn from the parties' Statement of Undisputed Material Facts.  Mot. Summ. J. 2–10.  Although the Statement of Undisputed Material Facts was presented by Deere in its Motion for Summary Judgment, Shelton never responded to these facts by identifying those with which she agreed or disagreed.  *See* Local R. 7.1(D)(2)(b).  Furthermore, Deere supported its Statement of Undisputed Material Facts by citation to attached exhibits consisting of relevant documentary evidence.  *See id.* 7.1(D)(1)(b).  Therefore, even though it is unclear to what extent these facts can be deemed to be the parties' agreed facts, Deere has properly submitted them and allowed Shelton the opportunity to dispute and augment them as required by the Local Rule.

Shelton began working for Deere on June 7, 2004.  ¶ 1.  Shelton started in an "incentive-based position," where she remained until 2011.  ¶ 3.  In April or May 2011, she bid into an inspector's helper position in Deere's Department 127.   ¶ 4.  Deere proceeded, accidentally, to overpay her for the next six months.  ¶ 5.  When it found out about the overpayment, it did not demand its money back, but adjusted Shelton's salary.  *Id.*  When she found out, Shelton behaved toward the payroll department in a way that Deere deemed inappropriate.  ¶ 6.  A supervisor attempted to speak with her.  ¶ 6.  At some point afterwards, she was confronted by four or five Deere employees riding "TD's" or "Cushmans"—small trucks.  At some later point still, Shelton was sent home.  *See* Shelton Dep. 80:3–81:8.

Subsequently, on September 10, 2011, and September 11, 2011, Shelton sent two emails to Deere's human resources staff, the first entitled "NO DRAMA" and the second "RE: HARRASSMENT."  *See* Mot. Summ. J. Exs. C1, C2, ECF No. 22-4.  In these emails, Shelton complained that she has been harassed by various unnamed figures at Deere "in an attempt to push [her] buttons."  *Id.* at 1.  Shelton mentioned the pay discrepancy issue, and a time she had had to leave work after having injured her wrist, but did not explain who was harassing her or why.  *Id.*  She did not mention a racist motive.  Indeed, Shelton acknowledged in her deposition that no one at Deere had done anything that she regarded as racist at this point, although she did say that, after being confronted by Deere's mini-truck riding employees, "[she could] understand how a person who was getting ready to be lynched felt."  Shelton Dep. 80:25–81:2.

Shelton did not return until September 23, 2011.  Disciplinary Action Hearing 2.  When her supervisor, Randy Venzke, returned to work on September 27, 2011, he tried to meet with Shelton to discuss her behavior toward the payroll department.  *Id.*  After Shelton refused to meet with him, he suspended Shelton and scheduled a disciplinary hearing for the following day.  *Id.*

2

at 3.  On September 28, 2011, a disciplinary hearing was held, and Shelton was suspended for 30 days for her conduct during the previous month.  ¶ 10.

Shelton then filed a claim with the Equal Employment Opportunity Commission ("EEOC") on December 20, 2011, and cross-filed it with the Illinois Department of Human Rights ("IDHR") on February 12, 2012 ("the first EEOC claim").  In these claims, Shelton stated:  "During my employment [at Deere], I complained of race discrimination.  Subsequently, I was suspended without pay for 30 days.  I believe that I have been discriminated against because of my race, Black, and in retaliation for engaging in protected activity . . . ."  EEOC Claim 4, Mot. Summ. J. Ex. 6, ECF No. 22-4.   On January 20, 2012, the EEOC notified Shelton that it was dismissing her charge for lack of evidence that the law had been violated.  ¶ 13.  The notice gave Shelton 90 days to file a lawsuit in federal court.  Mot. Summ. J. Ex. C8, ECF No. 22-4.  Shelton did not file a lawsuit, and wrote a letter to the IDHR stating that she voluntarily withdrew her claims both with the IDHR and EEOC.  ¶¶ 15–16, Mot. Summ. J. Ex. C9, ECF No. 22-4.

**Christine Edwards Incidents**

On August 18, 2012, Christine Edwards became Shelton's supervisor at Deere.  ¶ 17.  The two had a fractious relationship, and Shelton eventually filed another claim ("the second EEOC claim") with both the IDHR and EEOC on January 7, 2013.  ¶¶ 18–19, Jan. 7 IDHR and EEOC Claims, Mot. Summ. J. Exs. C11, C12; ECF No. 22-4.  The claim alleged harassment by Edwards in the form of:  decreasing Shelton's work area; leaving Shelton a note telling her to keep the area clean; refusing to speak to Shelton for the remainder of the day after Shelton refused to "clear her rack" before going to a doctor's appointment; yelling at Shelton for giving some paperwork to another employee; telling Shelton to write down her job duties so other

employees could perform those duties if Shelton was absent; telling Shelton to park in the parking lot nearest her place of employment and informing Shelton that she would be trained to drive a "fork truck"; assigning Shelton a "fork truck" that could pull "trains" and telling Shelton that she would have to learn how to pull "trains"; and stacking returned goods in Shelton's work area.  Jan. 7 IDHR Claim 2–3.  On September 3, 2013, after investigating the claims, the IDHR issued Shelton a Notice of Dismissal for Lack of Evidence, which gave Shelton the right to institute a civil action within 90 days.  Mot. Summ. J. Ex. C16, ECF No. 22-4.

At some point after the filing of the second claim, an incident occurred in which Edwards accused Shelton of sleeping on Shelton's "fork truck."  ¶ 25.  On February 9, 2013, Shelton emailed higher-ups at Deere indicating that she wanted to file harassment charges against Edwards, but not mentioning race.  Mot. Summ. J. Ex. C4, ECF No. 22-4.  Shelton was ultimately not disciplined for the sleeping incident, ¶ 27, but filed a grievance via her union that claimed Edwards' actions "where they concern employees of African American descent, are discriminatory in nature and harassing."  ¶ 28.  Deere denied the claim, and its internal investigation found the allegation unsubstantiated.  ¶¶ 29–30.

Later, someone failed to enter into Deere's system a vacation Shelton had planned to take—Shelton says the culprit was Edwards—and Shelton was issued a "three-day quit notice."[4] ¶ 31.  Although Shelton was ultimately allowed to retain her job and not disciplined, she emailed a Deere official on May 6, 2013, complaining that the incident had been harassment, although again not mentioning anything about racial motivation.  ¶¶ 33–34.  Nonetheless, Shelton filed a third claim with the EEOC and IDHR ("the third EEOC claim") on May 21, 2013, stating:

---

[4] Although not explained by either party, this appears to consist of Deere's construal of three or more unannounced days of employee absence as the employee's having quit.  The Court has encountered similar jargon in previous employment discrimination suits against Deere.  *See, e.g.*, *Freeburg v. Deere & Co.*, No. 4:11-CV-04035-SLD-JEH, 2014 WL 1258029, at *2 (C.D. Ill. Mar. 27, 2014).

"During my employment, I have been subjected to harassment.  I believe I have been discriminated against because of my race, Black . . . ."  ¶¶ 35–36.  On May 30, 2013, the EEOC again notified Shelton that her claim had been dismissed for lack of evidence that the law had been violated, and providing her with the right to file a lawsuit within 90 days of receiving the notice.  ¶¶ 37–38.  The instant lawsuit followed, filed on July 7, 2013.

**Shelton Leaves Work at Deere**

That was not the end of the matter, however, as Shelton has explained in numerous filings after her initial Complaint.  The filings are something like amendments to the complaint, containing a running narrative of new workplace incidents; anyway, the Court construes them as amendments, containing as they do descriptions of later events that Shelton appears to construe as having been discriminatory or retaliatory.  On August 27, 2013, Shelton felt that Edwards had been following her around her workplace, and went to the medical department in an attempt to escape.  ¶ 45.  On September 3, 2013, Shelton took leave from work to attend a 2–3 week "partial hospitalization program" at the Robert Young Center.  ¶ 47.  While she was gone from work, she began receiving weekly indemnity payments from Deere.  ¶ 48.

Shelton's doctor communicated to Deere that she was free to return to work on October 9, 2013, and on October 11, 2013, she was issued a three-day quit notice.  Venzke Aff. 2, Mot. Summ. J. Ex. C, ECF No. 22-4.  On October 15, 2013, her doctor wrote a note excusing her from working until October 16, 2013.  ¶ 49.  Shelton was afforded a reinstatement hearing on the matter on October 17, 2013, and was cleared to return to work.  ¶ 50.  However, on her first day back, October 24, 2013, Shelton became upset with her union representative when  Deere employees confronted her with a list of new job duties.  ¶ 51.  She went to the hospital, and told

doctors there that she was having homicidal thoughts toward her employer.  ¶¶ 51–52.  She never returned to work.

Over the course of the next year, Shelton's doctor submitted various letters indicating that she would not be able to perform her old job at Deere, but that she might be able to perform a different job.  ¶¶ 54–55.  On September 4, 2014, her weekly indemnity payments ended.  ¶ 56.  On September 12, 2014, her doctor sent Deere's attorney a letter indicating that she could return to work without restrictions.  ¶ 58.  Deere required Shelton to undergo an independent medical assessment before returning to work.  ¶ 60.  The doctor who performed the assessment determined that Shelton was not fit to return to work.  ¶ 62.  Deere finally fired Shelton on March 5, 2015.  ¶ 64.

## DISCUSSION

### I.    Legal Standard on a Motion for Summary Judgment

Summary judgment is the "put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (internal quotation marks omitted).  A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial—that is, whether there is sufficient evidence favoring the non-moving party for a jury to return a verdict in its favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Patel v. Allstate Ins. Co.*, 105 F.3d 365, 370 (7th Cir. 1997).  The court must view the evidence in the light most

favorable to the non-moving party and draw all reasonable inferences in that party's favor. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010) (citing *Anderson*, 477 U.S. at 255).

The movant in a summary judgment motion bears the initial burden of production— pointing the court to the materials in the record that "demonstrate the absence of a genuine issue of material fact" for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the nonmovant bears the ultimate burden of persuasion on a particular issue, however, the requirements on the movant are "not onerous" and "may be discharged by showing—that is, point[ing] out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (internal quotation marks omitted). Once the movant discharges her burden, the burden shifts to the nonmovant to "make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322. To satisfy this burden, a nonmovant must "go beyond the pleadings . . . to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in her favor." *Modrowski*, 712 F.3d at 1169 (internal quotation marks omitted). "A plaintiff may not defeat the defendant's properly supported motion for summary judgment without offering any significant probative evidence tending to support the complaint." *Tri-Gen Inc. v. Int'l Union of Operating Engineers, Local 150, AFL-CIO*, 433 F.3d 1024, 1038 (7th Cir. 2006) (internal quotation marks omitted).

**II.    Analysis**

As an initial matter, there is confusion about whether Shelton seeks to bring her claims under Title VII, 42 U.S.C. § 1981, or both. In her original Complaint, ECF No. 1, Shelton checked just the box for Title VII on the pro se complaint form she used, Compl. 2, and attached

the EEOC's right to sue letter associated with the third EEOC claim.  However, in her First

Amended Complaint, ECF No. 6, Shelton checked only the box for 42 U.S.C. § 1981, and did

not include a copy of any right to sue letter.  First Am. Compl. 2.  In her Second Amended

Complaint ECF No. 8, Shelton also checked only the box for 42 U.S.C. § 1981 (the form appears

to be a photocopy of the same form Shelton used in filing her First Amended Complaint, judging

from the identical scribble-marks and visual artifacts on both documents).  Shelton alleges

identical conduct and injuries in each of the three Complaints—the same boxes are checked for

Defendant's alleged discriminatory conduct in each document, and the brief account of

discrimination on the pro se complaint form itself (as opposed to the long narrative attachment)

appears identical.  Only the statutory basis differs.

The confusion matters because the challenges to the Second Amended Complaint that

Deere brings appear to be aimed at a Title VII claim.  Deere moves for summary judgment in its

favor on the grounds that: (1) certain portions of Shelton's Title VII claim arise from events that

formed the basis of the first (and/or second) EEOC claim, and are thus time-barred, Mot. Summ.

J. 17–19; (2) Shelton cannot make out a prima facie case of racial discrimination under Title VII,

*id.* at 19–22; and (3) Shelton cannot make out a retaliation claim because she shows no causal

link between her protected actions and her adverse employment consequences, *id.* at 23–26.

Deere appears to have proceeded on the (understandable) belief that Shelton's claim(s)

for relief arise entirely under Title VII.  "However, a trial court is obligated to give a liberal

construction to a pro se plaintiff's filings," *Nichols v. Michigan City Plant Planning Dept.*,

755 F.3d 594, 600 (7th Cir. 2014), and a liberal construction of Shelton's successive pleadings is

that she intended her claim for relief to arise under both statutes, as is common in employment

discrimination cases, in part because § 1981 discrimination claims are not limited to charges first

filed before the EEOC.  *See, e.g.*, *Hopkins v. Bd. of Educ. of City of Chicago*, 73 F. Supp. 3d 974, 983 (N.D. Ill. 2014) ("Unlike Title VII claims, § 1981 claims are not limited to allegations first filed in an EEOC charge, and plaintiffs need not obtain an EEOC right-to-sue letter."); *see also Patterson v. McLean Credit Union*, 491 U.S. 164 (1989), *superseded by statute on other grounds* ("Where conduct is covered by both § 1981 and Title VII, the detailed procedures of Title VII are rendered a dead letter, as the plaintiff is free to pursue a claim by bringing suit under § 1981 without resort to those statutory prerequisites.").

Were there a possibility of prejudice to Deere from the Court's expansive construal of Shelton's pleadings, Deere would be granted leave to address the § 1981 claims in separate filings.  However, as explained below, Deere sufficiently shows that there is no genuine issue of material fact as to discrimination and retaliation for purposes of Title VII or § 1981. Accordingly, the Court declines to consider Deere's arguments as to the time limits associated with Shelton's EEOC right to sue letters, [5] because even including those of Deere's actions that might be time-barred as the basis for Shelton's suit, she could not prevail before a jury on either § 1981 or Title VII theories.[6]

### A.  Discrimination

---

[5] There is no jurisdictional bar to the Court's consideration of the potentially-time barred portions of Shelton's claim.  *See St. Louis v. Alverno Coll.*, 744 F.2d 1314, 1316 n.2 (7th Cir. 1984) (explaining that filing within the 90-day time limit after receipt of an EEOC right to sue letter is not a jurisdictional prerequisite to suit).

[6] The Court recognizes that because Deere did not move for summary judgment as to Shelton's potential § 1981 claim, summary judgment on such a claim rendered here has the air of a sua sponte grant, which, while permissible, "warrants special caution." *Sawyer v. United States*, 831 F.2d 755, 759 (7th Cir. 1987).  However, such a grant may be appropriate where a party has "(1) proper notice that the district court [is] considering entering summary judgment and (2) a fair opportunity to present evidence in opposition to the court's entry of summary judgment." *Simpson v. Merchants Recovery Bureau, Inc.*, 171 F.3d 546 (7th Cir. 1999).  *Accord* Fed. R. Civ. P. 56(f) ("After giving notice and a reasonable time to respond, the court may . . . grant the motion [for summary judgment] on grounds not raised by a party . . . .").  In this case, both *Simpson* factors are strongly present because Deere has already moved against Shelton for summary judgment on the ground that she has not shown any evidence of racially discriminatory behavior or intent on Deere's part and, as explained below, the legal standards for Title VII and § 1981 discrimination and retaliation hew so closely to each other.   Shelton cannot argue that she is not on notice that Deere's motion potentially covers both Title VII and § 1981 claims arising out of the same alleged course of conduct.

### 1.  Legal Standard

Title VII makes it illegal for employers to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ."  42 U.S.C. § 2000e-2(a)(1).  Section 1981 "protects the right of all persons to make and enforce contracts regardless of race."  *Carter v. Chicago State Univ.*, 778 F.3d 651, 657 (7th Cir. 2015).  Courts "analyze § 1981 discrimination claims in the same manner as claims brought pursuant to Title VII of the Civil Rights Act."  *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011).  *See also Gonzalez v. Ingersoll Mill. Mach. Co.*, 133 F.3d 1025, 1035 (7th Cir. 1998) ("The same standards governing liability under Title VII apply to section 1981.");  *Turner v. ABT Elecs., Inc.*, 254 F. Supp. 2d 1018, 1020 (N.D. Ill. 2003) (applying only a Title VII analysis to plaintiff's claims on summary judgment where plaintiff sued under both Title VII and § 1981).

To avoid summary judgment in a discrimination case under Title VII or § 1981, a plaintiff may show discriminatory intent on the part of her employer by either the direct or indirect method of proof.  *Marshall v. Am. Hosp. Ass'n*, 157 F.3d 520, 525 (7th Cir. 1998).

Under the direct method of proof, a plaintiff may show either direct or circumstantial evidence of an employer's discriminatory intent.  *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 722–23 (7th Cir. 1998).  Direct evidence would more or less have to be "an acknowledgment on the part of the employer of discriminatory intent."  *Id.* at 722.  Since "employers have taught their supervisory employees not to put discriminatory beliefs or attitudes into words oral or written," *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994), the more usual means of direct proof is (somewhat confusingly) via circumstantial evidence, of which the Seventh Circuit has explained that there are three general varieties, *id.*  The first is

10

"suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Id.* The second is evidence, statistical or anecdotal, that similarly situated employees of a different race received better treatment than the plaintiff did. *Id.* And the last kind of evidence is material suggesting that the plaintiff was qualified for a job but passed over or replaced by a person of another race. *Id.* By hypothesis, no one piece of evidence in any category is sufficient to get past summary judgment, but each *type* of evidence may be sufficient in itself. *Id.* This collaged network of data that, in the aggregate, may be convincing enough to survive a summary judgment motion has been aptly termed a "convincing mosaic of circumstantial evidence." *Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 643 (7th Cir. 2013) (citing *Troupe*, 20 F.3d at 737).

A plaintiff may also proceed by the indirect approach, which uses the *McDonnell-Douglas* burden shifting method. *See McDonnell–Douglas Corp. v. Green*, 411 U.S. 792, 93 (1973). Under this approach, a plaintiff must first make out a prima facie case of discrimination by showing that (1) she was a member of a protected class, (2) she was meeting her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees not in her protected class received more favorable treatment. *E.E.O.C. v. Our Lady of Resurrection Med. Ctr.*, 77 F.3d 145, 148–49 (7th Cir. 1996). If plaintiff does so, the burden shifts to the defendant, who must then articulate a legitimate, non-discriminatory reason for its actions. *Id.* The burden then shifts back to the plaintiff to show that the offered explanation was merely pretextual. *Id.*

### 2. Shelton's Discrimination Claim

Shelton contends that Deere discriminated against her by failing to stop harassment, primarily by Edwards; by decreasing her pay; by disciplining her; by requiring her to go back to work after a job-related injury; and by not applying full disciplinary procedures to her. Second Am. Compl. 4. Deere contends that Shelton has not made out a prima facie case under the indirect method of *McDonnell-Douglas* burden shifting. Mot. Summ. J. 19–21. While Deere puzzlingly does not address itself to the direct method of proof, Shelton's evidence of discrimination is insufficient to survive summary judgment on either method.

Shelton's claim cannot survive on the direct approach because the "bits and pieces," *Troupe*, 20 F.3d at 736, of evidence she marshals do not come close to creating a "convincing mosaic," *Hobgood*, 731 F.3d at 643. Much of the "evidence" Shelton offers is merely her own subjective and conclusory assertions that she felt she was being racially discriminated against at various points—her first EEOC claim ("I believe that I have been discriminated against because of my race, Black," EEOC Claim 4, Mot. Summ. J. Ex. C6), her grievance against Edwards (Edwards's actions against African-American employees said to be "discriminatory in nature and harassing," Agreed Facts ¶ 28, Mot. Summ. J. 2–11), and her third EEOC claim ("I believe I have been discriminated against because of my race, Black," *id.* ¶ 36). The record sometimes directly contradicts these conclusory allegations—it shows that, despite her assertions to the contrary in her first EEOC claim, Shelton did not complain earlier of race discrimination—and, more commonly, supports Shelton's allegations only insofar as it shows that on some occasion or other, Shelton herself construed an apparently innocent situation as having menacing racial overtones—as when she recounted the confrontation with the mounted Deere employees.

The scraps of non-subjective evidence that Shelton does offer are few and far between, and each one ultimately comprises only an anecdote provided by Shelton, without the support of depositions or affidavits.

- Shelton states in her deposition that, in a meeting with her union representative and others, she "accused [Edwards] of being racist."  Shelton Dep. 94:24.  At that time, Shelton said:  "[Y]ou have a problem with me, you have a problem with Oscar Scott, and you have a problem with Cece . . . ."  *Id.* at 95:4–6.  However, Shelton supports this claim merely by stating in her deposition that "everybody knows that [Edwards] had Cece crying."  *Id.* at 95:19-20

- Shelton states in her deposition that she feels "procedure was not followed properly" by Deere in dealing with her complaints, but does not identify what this procedure might have been, or how it was not followed.  *Id.* at 213:15–214:2.

- She claims that once a (presumably non-African American) employee cursed at a supervisor but was not disciplined as severely as she was, *id.* at 215:19–25, but does not identify who, when or anything further about the incident.

- Shelton states that on one occasion, an African American employee ran into something and was fired, while a white employee ran into something and was not fired, *id.* at 216:10–19, but does not identify who or provide any further detail.

- Shelton states that a Latino employee was fired for sexual harassment without Deere investigating adequately, but provides no further information.  *Id.* at 217:5–14.

Deere has carried its burden on summary judgment by "showing—that is, point[ing] out to the district court—that there is an absence of evidence to support [Shelton's] case." *Modrowski*, 712 F.3d at 1168.  These scattered facts, devoid of any specificity and connected to

the facts Shelton alleges about her own case in only the loosest possible way, do not support the direct inference that Deere had a discriminatory motive in taking any of the actions against Shelton that it took.  Shelton's response, in turn, "may not rest upon the mere allegations or denials of [her] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Shelton has not done so— indeed, her Response to Deere's Motion for Summary judgment consists of a confusing potpourri of copy-pasted Facebook rants, fill-in-the-blank legal forms, and copies of Shelton's medical evaluations.  No jury could conclude on the basis of the evidence Shelton has submitted that Deere discriminated against her, so her case fails under the direct method of proof.

Shelton fares no better under the indirect approach to proving discrimination, because in order to make out a prima facie case, she must show that she was meeting her employer's legitimate work expectations, and she cannot.  *Moser*, 406 F.3d at 903.  Shelton offers no evidence whatever either of what her employer's job expectations were, or that she was meeting them.  On the contrary, much of the material in the record suggests that on the occasion Shelton was disciplined, and on some occasions where she was not, she failed to meet Deere's legitimate job expectations.

- Shelton refused to meet with a manager to discuss the payroll dispute and, in his view, behaved inappropriately toward members of the payroll department.  Venzke Dep. ¶ 8. Several employees at Deere claimed at the disciplinary hearing then held that, when they tried to contact Shelton to discuss the dispute, she fled from them on some type of vehicle ("Wanda got her tire aired up and proceeded to drive off").  Disciplinary Action Hearing 2, Mot. Summ. J. Ex. C18, ECF No. 22-4.  Deere's "rules of conduct" prohibit employees

from being insubordinate, including refusing to follow instructions from supervisors. *Id.* at 3.

- Shelton appears to have been disciplined in 2011 for excessive tardiness and absences from work, a discipline that was reduced to a written warning on July 21, 2012. Compl. She also appears to have failed on several occasions to meet Deere's productivity requirements, as memorialized by a fragmentary account of a disciplinary hearing Shelton included, unnumbered, with her First Amended Complaint. Am. Compl.

- Most significantly, Shelton's mental state at times prevented her from performing even her most basic job duties. When she left work in September of 2013 and went to the hospital, she told the staff there that she was feeling homicidal, and that she was going to hurt her supervisor. Shelton Dep. 100:15–19. The running narrative of her work-related grievances included with her Complaints, which often seems to have been composed contemporaneously with the events it describes, frequently states that some events cause her to "feel rage." And her extended absence from 2013–2014, according to her doctor, resulted from her inability to perform her job without feeling debilitating stress. Agreed Facts ¶¶ 54–55.

The records suggests that Shelton failed to meet her employer's legitimate job expectations on numerous occasions by being insubordinate, by failing to show up to work on time and/or failing to meet Deere's production standards, and by frequently leaving work for days or months at a time because of anger issues. *Cf. Williams v. Airborne Exp., Inc.*, 521 F.3d 765, 768 (7th Cir. 2008) (holding that plaintiff did not show he was meeting legitimate job expectations in light of repeated disciplinary action and insubordination); *Suarez v. Sacred Heart Hosp.*, 225 F. App'x 404, 406 (7th Cir. 2007) (holding that it was appropriate for district court to find that plaintiff

nurse whose errors could have posed a risk to patient care failed to meet her employer's legitimate job expectations).  Furthermore, in order to prevail under the *McDonnell-Douglas* test, Shelton must affirmatively show that she was meeting Deere's job expectations.  She has not done so, so she cannot prevail on the indirect approach.

### B.  Retaliation

#### 1.  Legal Standard

"Title VII makes it unlawful for an employer to discriminate against any of [its] employees or applicants for employment . . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]."  *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 662 (7th Cir. 2006) (quoting 42 U.S.C. § 2000e-3(a)).  Section 1981 applies in the retaliation context if "one person takes action against another for asserting the right to substantive contractual equality provided by § 1981."  *Smith v. Bray*, 681 F.3d 888, 896 (7th Cir. 2012).  The methods for proving retaliation are the same for § 1981 claims.  *Id.* ("The Supreme Court has held that § 1981 authorizes claims for retaliation . . . . The substantive standards and methods of proof that apply to claims of racial discrimination and retaliation under Title VII also apply to claims under § 1981.").

As with a claim for employment discrimination, a plaintiff may proceed on either the direct or indirect approach to prove retaliation under Title VII.  *Moser v. Ind. Dept. of Corr.*, 406 F.3d 895, 903 (7th Cir. 2005).  To show direct evidence of retaliation at the summary judgment phase, a plaintiff must show (1) that she engaged in a statutorily protected activity, (2) that a materially adverse action was taken against her, and (3), that there was a causal connection between the two.  *Coleman v. Donahoe*, 667 F.3d 835, 859 (7th Cir. 2012).  As with evidence of discrimination, the causal connection, and the retaliatory intent that subtends it, may be shown

16

either directly or via a convincing mosaic of circumstantial evidence. *Hobgood*, 731 F.3d at 643.

In a retaliation case, the categories of circumstantial evidence a plaintiff might offer have been

identified by the Seventh Circuit as: "(1) suspicious timing; (2) ambiguous statements or

behavior towards other employees in the protected group; (3) evidence, statistical or otherwise,

that similarly situated employees outside of the protected group systematically receive better

treatment; and (4) evidence that the employer offered a pretextual reason for an adverse

employment action." *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601

(7th Cir. 2011).

      Under the indirect method, the *McDonnell Douglas* burden-shifting framework again

applies. A plaintiff must first establish her prima facie case by showing that "(1) she engaged in

a statutorily protected activity; (2) she met the employer's legitimate expectations; (3) she

suffered an adverse employment action; and (4) she was treated less favorably than similarly

situated employees who did not engage in statutorily protected activity." *Moser v. Indiana Dept.*

*of Corr.*, 406 F.3d 895, 903 (7th Cir. 2005). The burden then shifts to the employer to present

evidence of a non-discriminatory reason for its employment action. *Id.* If the employer meets

the burden, then the burden shifts back to the plaintiff, who must show that the offered reason is

pretextual. *Id.*

### 2. Shelton's Retaliation Claim

      Almost all of the behavior Shelton alleges on Deere's part as discriminatory could, after

perhaps the emails she sent after the pay incident on September 10 and September 11, 2011, and

certainly after the filing of the first EEOC claim on February 12, 2012, be viewed as potentially

retaliatory as well. This includes the 30-day suspension on September 27, 2011, and all of the

behavior identified on Edwards's part in the second EEOC claim: decreasing Shelton's work

area, telling her to clean it, refusing to speak to her, yelling at her, making her write down her job duties, telling her where to park, training her to drive a "fork truck" and giving her a "fork truck" that could pull "trains," and stacking things in Shelton's work area.  It also includes Edwards's later alleged stalking of Shelton in the Deere plant, and Deere's ultimate termination of Shelton's employment after a year's absence.

Leaving aside which of Shelton's many complaints, either to Deere or the EEOC/IDHS, might have been protected by Title VII and § 1981, and leaving aside the question of which of Deere's actions may have counted as adverse employment actions, Shelton cannot show retaliation via the direct approach because she cannot show any causal connection between *any* of her complaints and *any* of Deere's actions.  She points to nothing in the record—and indeed, the record contains nothing—that would support the inference that any of the misfortunes she claims befell her at Deere's hands happened because Deere or any of its employees were upset by her frequent complaints.  To the contrary, the record suggests that Deere went to great lengths to accommodate Shelton, regardless of her complaints, by investigating and adjudicating those complaints thoroughly in its internal review process, and at times granting Shelton the benefit of the doubt, as when Deere decided not to discipline her for an apparently unexcused three-day absence in April or May of 2013, or when Deere allowed her to return to work after she remained absent longer than permitted in October 2013—or, for that matter, when Deere did not demand repayment of the amount by which it determined it had overpaid Shelton in 2011.

About the only evidence of retaliation is that some of Deere's actions occurred after some of Shelton's complaints.  "[W]hile there is no bright-line rule as to the amount of evidence necessary to survive summary judgment under the direct method, . . . . it is clear that mere temporal proximity is not enough to establish a genuine issue of material fact." *Tomanovich*,

457 F.3d at 665.  In this case, there is not even a compelling temporal proximity between Shelton's complaints and Deere's alleged acts of retaliation.  During the pay incident, Shelton's emails to Deere were sent on September 10 and 11, 2011.  She was only disciplined on September 28, 2011, after she had eluded her manager when he tried to speak with her about the payroll incident.  Edwards's behavior that gave rise to the second EEOC claim, filed on January 7, 2013, occurred more than a year after the events that gave rise to the first EEOC claim, filed in December 2011.  And Deere's eventual finding that Shelton was unfit to return to work (rendered via a third-party doctor) and termination of Shelton's employment occurred more than a year after she filed her third EEOC claim, on May 21, 2013, and the instant lawsuit.  Timing less suspicious is difficult to imagine.  *See Tomanovich*, 457 F.3d at 665 (collecting cases).

Furthermore, Shelton cannot prevail in her claim for retaliation on the indirect approach either, because she cannot show that she was meeting her employer's legitimate job expectations, as explained above.

## III.    Other Motions

Plaintiff also submitted a document, ECF No. 20, docketed by the Clerk as a Motion in Letter Form.  The document contains a mélange of materials, many of which are duplicative of material already submitted in some of the documents that were docketed as amended complaints. Its first page states again that Shelton has been "maliciously harassed," and asks the Court to consider, in making its ruling, the seriousness of the offense, the need to hold Deere accountable, the importance of upholding the law, the "degree of malicious intent," and the importance of Deere's treating its employees with respect.  Mot. Letter Form 1–2.  Deere moves to strike this document, ECF No. 24, pursuant to Rule 12(f), on the grounds that it is immaterial and redundant.  Mot. Strike ¶¶ 6, 10.  The Court does not reach Deere's motion because the Court

grants Deere's motion for summary judgment in its entirety, having reviewed the material in Shelton's disputed document.  Deere's motion to strike, and Shelton's Motion in Letter Form (if motion it is), are for this reason moot.

**CONCLUSION**

Accordingly, Deere's Motion for Summary Judgment, ECF No. 22, is GRANTED in its entirety, and Plaintiff's Motion in Letter Form, ECF No. 20, and Deere's Motion to Strike that motion, ECF No. 24, are DENIED AS MOOT.  Because the Court grants summary judgment to Defendant, and no claims remain, entry of final judgment is appropriate.  The Clerk is directed to enter judgment in favor of Deere and close the case.

Entered this 24th day of September, 2015.

s/ Sara Darrow

_____

SARA DARROW
UNITED STATES DISTRICT JUDGE